UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SHUDDE FATH, SAVE BARTON CREEK ASSOCIATION, FRIENDS OF THE WILDFLOWER CENTER, CAROLE KEETON, FRANK CLOUD COOKSEY, SUSAN AND JERRY JEFF WALKER, DR. LAURIE DRIES, SAVE OUR SPRINGS ALLIANCE, INC., MOPAC CORRIDOR NEIGHBORS ALLIANCE, THE FRIENDSHIP ALLIANCE OF NORTHERN HAYS COUNTY, INC., and CLEAN WATER ACTION,  *Plaintiffs,* | § § § § § § § § § § § § | |
| v. | § § | No. 1:16-cv-234 |
| TEXAS DEPARTMENT OF TRANSPORTATION and CENTRAL TEXAS REGIONAL MOBILITY AUTHORITY,  *Defendants.* | § § § § § § | |

## COMPLAINT

### I.   PREAMBLE: NATURE OF ACTION

1.     This action is for injunctive and declaratory relief concerning an inter-connected set of far-reaching actions that the principal state and regional transportation agencies are instituting in the recharge zone of the Barton Springs segment of the Edwards Aquifer. The agencies have committed more than a half billion dollars to transform the transportation infrastructure for the southern half of the MoPac roadway system and extend its southern end by tacking on a brand new roadway, Phase I of State Highway 45 Southwest, across pristine, environmentally critical land and water recharge features. The agencies have launched this massive set of inter-connected actions as a single course of action without undertaking any advance look at the cumulative environmental consequences of their action and without considering any alternatives to their South

MoPac endeavor.

2.     The National Environmental Policy Act, referred to as NEPA, governs the agencies' coordinated set of actions. It mandates precisely what the agencies have so studiously avoided doing: taking a "hard look" at the *cumulative* environmental consequences of these inter-connected, temporally overlapping set of actions *before* launching any of them. The plaintiffs seek to stop any implementation of the South MoPac initiative (including the entirely new tolled roadway that is part of it) until the agencies have complied with NEPA by performing a comprehensive review of the cumulative environmental effects of all of the MoPac South-related actions they are poised to set in motion.

3.     The plaintiffs also seek a narrower injunction to prohibit the agencies from undertaking any actions in furtherance of what they have labeled the "Intersections" project, either by itself or as affected by or connected with any other element of their current MoPac South program, because it will constitute an unauthorized constructive use of the nationally-recognized Lady Bird Johnson Wildflower Center in violation of 23 U.S.C. §§ 138 and 49 U.S.C. § 303, commonly referred to simply as "Section 4(f)."

## II.  JURISDICTION AND VENUE

4.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 & 1361, 5 U.S.C. §§ 701-706, 42 U.S.C. §§ 4321-4370d, and 23 U.S.C. §§ 138 and 327(a)(2)(C), (d)(1), & (d)(2), and 49 U.S.C. § 303.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 124(d)(1) and 1391(b)(1), (b)(2), & (e)(1).

### III. PARTIES

**A.     Plaintiffs**

6.     Plaintiff Shudde Fath is a retired employee of the State of Texas and long-term community leader in Austin. Ms. Fath served as the Treasurer for the Save Barton Creek Association for twenty-nine years. Over the years her work with SBCA included on several occasions seeking to minimize the harm to Barton Springs and Barton Creek caused by proposed extensions and expansions of MoPac. Her work also included advocating for and winning city voter-approved bond funds to buy lands to protect Barton Springs along the MoPac corridor, including lands on both sides of the proposed SH 45 SW. In recognition of her work, the City of Austin named a 77-acre preserve on Barton Creek adjacent to Loop 360 the "Shudde Fath Preserve." If built as proposed, the SH 45 SW/MoPac South project will pollute water flowing in Barton Creek as it runs along one side of the Shudde Fath Preserve.  For many years Ms. Fath was a frequent swimmer at Barton Springs. Today, with Ms. Fath now at 100 years of age, the continued environmental integrity of Barton Springs remains a matter of high importance to her, in part as a legacy of her long-time efforts to protect it and in part due to her long-time personal enjoyment of it. Ms. Fath frequently passes through Zilker and Lady Bird Lake Park, where her enjoyment of those parks would be marred by the visual intrusion of the proposed addition of double deck toll lanes over the parks and the lake. Expanding MoPac through the parks and over the lake would also diminish her enjoyment of SBCA annual meetings held at the Zilker Clubhouse, which overlooks the parks, the lake, MoPac and downtown. Ms. Fath lives just above Barton Springs, in the Zilker neighborhood. She previously drove and now frequently rides as a passenger on MoPac and the roadways connecting to MoPac. Ms. Fath's conservation, recreation, property, aesthetic, and personal safety and well-being will be harmed if the SH 45 SW/MoPac Intersections/MoPac South project goes forward as currently planned and without a comprehen-

sive analysis in advance of impacts and alternatives.

7.     Plaintiff Save Barton Creek Association ("SBCA") is a nonprofit charitable corporation that has been working to protect the six creeks that serve as the primary watershed for Barton Springs since 1979. Members of the association hike and swim in Barton Creek and Barton Springs, enjoy bird watching, snorkeling, and nature study on the Barton Creek greenbelt and at the springs; and assist with tours and cleanups of Barton Springs watershed lands, caves, wildlife preserves, and parks. SBCA and its members have supported with volunteer time and financial contributions the City of Austin's acquisition, protection, and maintenance of parks and watershed preserve lands that abut and would be directly harmed by the construction of the proposed SH 45 SW Phase I, MoPac Intersections, and MoPac South Express Lanes projects. SBCA previously took legal action to protect the Barton Springs watershed from the extension of South MoPac and the construction of the first piece of SH 45 West (from the southern end of MoPac west to FM 1826). SBCA members have filed public comments on the proposed SH 45 SW Phase I, MoPac Intersections, and MoPac South Express Lanes projects. The conservation, natural and cultural history, outdoor education, and human health interests of SBCA and of its members will be harmed by the three pieces of the proposed MoPac South extension and expansion and the failure to study these three segments together comprehensively and especially the failure to evaluate the direct, indirect, and cumulative effects on the Edwards Aquifer, Barton Springs, Barton Creek, and Onion Creek. SBCA and its members are further harmed by the failure to evaluate and pursue alternatives to the three piece project that would improve north-south traffic flow into and through Austin without diverting traffic from areas downstream of the Barton Springs Edwards Aquifer onto new and expanded travel routes over the Barton Springs Edwards Aquifer recharge zone.

8.      Plaintiff Friends of the Wildflower Center ("Friends") is an unincorporated associa-
tion of persons who visit, volunteer at, and donate to the Lady Bird Johnson Wildflower Center.
Friends members regularly enjoy the gardens and educational programs and facilities at the
Wildflower Center. The Center is now owned and operated by the University of Texas at Austin,
with some level of independence as a distinct educational, community, and research institution.
The proposed elevated interchange at the SH 45 SW/MoPac South intersection will be visible
from and intrusive on the beauty and quiet of the gardens and facilities of the Wildflower Center.
Proposed sound walls adjacent to the Center's gardens and walking trails will only mitigate, not
eliminate, highway noise and will harm the beauty and outdoor experience of Center visitors.
The increase in traffic, traffic noise, and high speed traffic hazards immediately adjacent to the
Wildflower Center will harm the visitor experience enjoyed by Wildflower Center visitors, in-
cluding the visitor experience of Friends of the Wildflower Center members. The conservation,
research, civic, and educational interests of Friends of the Wildflower Center will be directly
harmed by the failure of defendants to comply with applicable environmental protection laws in
the course of developing, constructing, and operating the three segments of the MoPac South
project.

9.      Plaintiff Carole Keeton served as Austin's mayor from 1977 to 1983 and as mem-
ber and president of the Austin Independent School District Board of Trustees from 1972 to
1977. Ms. Keeton also served as Texas Comptroller of Public Accounts from 1999 to 2007. As
Texas Comptroller, and at the request of state and local officials citing serious oversight con-
cerns of CTRMA, she reviewed the operations of CTRMA and presented the *Special Report,
Central Texas Regional Mobility Authority: A Need for a Higher Standard* to the people of Texas
in March, 2005. Some of the shortcomings in CTRMA transparency and accountability identified

5

by Ms. Keeton in 2005 are reflected in CTRMA's approach to the MoPac South program that is the subject of this case. Ms. Keeton regularly drives on MoPac and neighborhood streets that cross under and connect to MoPac. Ms. Keeton continues to advocate for affordable, responsible, transparent, accountable government and for the well-being of Austin schools and most importantly the well-being of all the school children. Ms. Keeton's personal interests as a commuter, taxpayer, civic leader, volunteer and advocate for transparency and accountability in government are harmed by the actions of CTRMA and TxDOT in pursuing the SH 45 SW/MoPac Intersections/MoPac South project without first preparing a comprehensive analysis of the proposal, its costs, and potential alternatives. Ms. Keeton's personal interests in the well-being of Austin High School are also potentially harmed by Defendant's proposal to direct more traffic onto MoPac and to develop the MoPac project without full analysis and disclosure of how traffic flow to, from, and adjacent to Austin High School will be managed.

10.    Frank Cloud Cooksey is a resident of Austin, Travis County, Texas, living near MoPac at 2208 Matthews Drive, Austin, Texas 78703, in a 1926 house built by his Grandfather, Bedford Frank Rowe, one of the chief designers and constructors of the Lions Municipal Golf Course in West Austin. Mr. Cooksey often uses the MoPac expressway to access Barton Springs and the Zilker Botanical Garden in Zilker Park. Mr. Cooksey served as Mayor of Austin, Texas from 1985-1988. Mayor Cooksey was the President of the Save Barton Creek Association in the early 1980s, and engaged in numerous activities designed to protect the environmentally sensitive Edwards Aquifer recharge zone and Barton Creek, which is located in areas affected by the run off and pollutants generated by Highway 1 (MoPac). Prior to becoming Mayor, Mr. Cooksey served on the City of Austin task forces that provided standards for development in Williamson Creek and the Bear, Little Bear, and Onion Creek areas of the recharge zone and contributing

zones of the Edwards Aquifer. While Mayor, Mr. Cooksey led a City Council that adopted the Comprehensive Watershed Ordinance, designed to establish development standards that gave additional protection to sensitive areas of the Edwards Aquifer contributing and recharge zones. Also, while serving as Mayor, Mr. Cooksey originated the idea of a by-pass route to I-35 which has become State Highway 130 (though not a toll road in his plan), east of Austin, in order to assure that traffic flow could be enhanced for traffic moving north and south without passing over the Edwards Aquifer area to the West. Mayor Cooksey and the City Council on which he served, also worked with Senator Gonzalo Barrientos to create the Barton Springs Edwards Aquifer Conservation District to regulate the water usage taken from the Edwards Aquifer. Since leaving office as Mayor, Mr. Cooksey has constantly supported efforts to protect the Edwards Aquifer and Barton Springs from pollution. The MoPac South-related activities recounted in the factual allegations below would harm Mr. Cooksey's interests in conservation, recreation, and transportation reflected herein.

11.     Plaintiffs Susan and Jerry Jeff Walker live in West Austin, seven blocks from MoPac, near the proposed northern end of the MoPac South toll express lanes. Jerry Jeff has been a regular swimmer at Barton Springs in the past and still swims at the springs during the summer months. The Walkers also enjoy walking on the hike-and-bike trail on Lady Bird Lake where they pass under the existing MoPac bridge. Over the last 35 years Susan and Jerry Jeff have volunteered, attended and spoken at key public hearings, and donated and helped raise money to protect Barton Springs, Barton Creek and Lady Bird Lake. The Walkers also frequently drive on and pass under MoPac. If SH 45 SW is built, diverting additional traffic onto MoPac, and South MoPac is expanded as proposed, the resulting increase in traffic and water, air, and noise pollution will harm the Walkers conservation and recreation interests.

12.    Plaintiff Dr. Laurie Dries earned her Ph.D. at the University of Texas at Austin studying freshwater vertebrates. Dr. Dries worked for 11 years as the lead conservation biologist for the Barton Springs and Austin Blind Salamander Program for the City of Austin. She spent thousands of hours in Barton Springs studying Barton Springs and Austin Blind salamanders. She developed and implemented plans for restoration of the Barton Springs ecosystem. The success of this habitat restoration is critically dependent on the quality and quantity of water arriving at Barton Springs from the upland watershed. Dr. Dries continues to study and take actions to protect Barton Springs, Austin Blind, and other aquatic Eurycea salamanders that live in the springs and waters of the Texas Hill Country. Dr. Dries also enjoys swimming and observing wildlife at Barton Springs. Dr. Dries' conservation, scientific, and recreation interests will be harmed by pollution of Barton Springs and of salamander habitat caused by the construction and operation of the SH 45 SW, Phase I, MoPac Intersections and MoPac South Express Lanes project and by the failure of defendants to comply with NEPA requirements in advance of extending and expanding South MoPac.

13.    Plaintiff Save Our Springs Alliance, Inc. ("SOS"), is a nonprofit charitable corporation established in 1992 to protect the land, water, and wildlife of the Edwards Aquifer region and the natural and cultural heritage of the Texas Hill Country. SOS and its members engage in a range of outdoor education, conservation-oriented research, and conservation advocacy activities, including, among others, filing written comments in the environmental study processes for SH 45 SW Phase I, MoPac Intersections, MoPac South Express Lanes, FM 1626, and Oak Hill Parkway projects. SOS members regularly swim in Barton Creek and Barton Springs, hike on the Barton Creek greenbelt and Lady Bird Lake hike-and-bike trail directly below and adjacent to MoPac, and enjoy Zilker Park, Lady Bird Lake, and other parks and preserves along the South

MoPac corridor. SOS members include scientists who study and work to protect the endangered Barton Springs and Austin Blind salamanders. SOS members petitioned to list the Barton Springs salamander as endangered and SOS brought successful legal action that led to the listing of the Barton Springs salamander as endangered. One SOS members owns 385 acres immediately adjacent to the proposed SH 45 SW, Phase I and MoPac Intersections projects and the elevated interchange that would tie them together. This land is protected by a City of Austin-owned conservation easement that strictly limits development and protects waters, wildlife and scenic beauty of the property. As proposed, the MoPac South endeavor, including SH 45 SW, will cause direct harm to the conservation, aesthetic, and natural heritage values of this land and the waters that fall on and recharge the Edwards Aquifer on this land. Some SOS members also enjoy visiting the Zilker Botanical Gardens and Austin Nature & Science Center, both of which adjoin MoPac South and would be harmed by noise, air, and water pollution and visual intrusion caused by the construction and operation of the MoPac South endeavor. Some SOS members regularly drive on MoPac, where they enjoy the green medians and parks within and alongside the MoPac right-of-way. The conservation, outdoor education, aesthetic, natural and cultural heritage preservation, and public health interests of SOS and its members will be harmed by the planned construction and operation of the SH 45 SW Phase I/MoPac Intersections/MoPac South Express Lanes system.

14.    Plaintiff MoPac Corridor Neighbors Alliance ("MCNA") is an unincorporated association of neighborhood leaders from neighborhoods adjacent to and along the MoPac corridor, from southwest of MoPac, along FM 1826, to MoPac north of Cesar Chavez. MCNA members live in the Circle C, Maple Run, Old West Austin, Travis Country, West Austin, Zilker, and Barton Hills neighborhoods, among others. MCNA members regularly drive on MoPac and

many of them can hear MoPac traffic from their homes. MCNA is organized to protect property values and the quality of life of those who live and own homes along MoPac and also to protect the safety and well-being of current MoPac commuters. The actions of defendants in moving to build the MoPac South system in violation of NEPA requirements harms the property, aesthetic, conservation, and personal health and safety of MCNA and its members. Defendants moves to build SH 45 SW Phase I first, diverting I-35 and FM 1626 corridor traffic onto MoPac, thereby increasing congestion on an already overly congested MoPac, damages MCNA and its members interests as commuters and as citizen interested in improving traffic flow on MoPac.

15.     Plaintiff The Friendship Alliance of Northern Hays County, Inc. ("Friendship Alliance") is a not-for-profit corporation dedicated to protecting the quality of life and public health and safety of residents in Northern Hays County, and in particular, to representing the interests of residents and established neighborhoods located along FM 1826 and US 290 West. Currently Friendship Alliance represents, and has member participants from, the Goldenwood, Goldenwood West, Radiance, Fieldstone, and Blue Creek neighborhoods. Friendship Alliance has participated in the Keep MoPac Local coalition and provided input to the public processes on the proposed extension and expansion of MoPac South. Many, and perhaps most, residents living in Friendship Alliance neighborhoods frequently drive on MoPac and SH 45 West in traveling to and from Austin. MoPac South is the shortest and by far most utilized route into downtown Austin from the FM 1826 and US 290 West corridors. As proposed, the extension of MoPac South with the proposed SH 45 SW would harm the interests of Friendship Alliance members by making traffic on MoPac South significantly worse, especially in the free or "general purpose" lanes, and by encouraging more unmanaged growth in Northern Hays County that would harm the rural character, scenic beauty, water resources, traffic flow, and quality of life in Northern Hays Coun-

ty. This harm should be legitimately considered and would likely be reduced or avoided if there were first prepared a comprehensive analysis of the direct, indirect and cumulative impacts of the proposed SH 45 SW and MoPac South extension with a genuine good faith consideration of alternatives to the SH 45 SW extension of MoPac South to FM 1626 and on to Interstate 35.

16.    Plaintiff Clean Water Action is a non-profit corporation working across the United States to protect the waters and aquatic habitats of our nation. Clean Water Action has a local office in Austin, Texas and has worked actively for more than twenty-five years to protect Barton Springs and the Barton Springs Edwards Aquifer. Clean Water Action is an active member of the "Keep MoPac Local" coalition and has actively participated in the public involvement processes for SH 45 SW, Phase I, MoPac Intersections, and MoPac South Express Lanes. Clean Water Action has members who regularly enjoy the waters and wildlife of Barton Springs, Barton Creek, and Lady Bird Lake. The conservation, recreation, and civic interests of CWA and its members are adversely affected by the actions of defendants to build the MoPac South system, including SH 45 SW, in violation of NEPA and other applicable federal environmental protection laws.

**B.    Defendants.**

17.    Defendant Texas Department of Transportation ("TxDOT") is a state agency with principal executive offices located at 125 East Eleventh Street, Austin, Texas 78701. It may be served with citation there through its Executive Director, James Bass. In December 2014, the State of Texas and TxDOT on the one hand and the Federal Highway Administration ("FHWA") on the other entered into a formal memorandum of understanding ("2014 Texas-NEPA MOU") establishing that, for the transportation-related actions that are the subject of this lawsuit, TxDOT is acting in the capacity of a *federal* agency, specifically as the FHWA.

11

18.   Defendant Central Texas Regional Mobility Authority ("CTRMA") is a political subdivision of the State of Texas, with its executive offices located at 3300 North Interstate Highway 35, Suite 300, Austin, Texas 78705, where it may be served with citation through its Executive Director, Mike Heiligenstein. For the transportation-related activities that are the subject of this lawsuit, CTRMA acts under contract as an agent for TxDOT. CTRMA also will be the lessee (from TxDOT, the lessor) of the right-of-way and the operator of the tolled parts of the roadways at issue.

## IV. FACTS

**A.     MoPac snapshot: today and soon.**

19.   This lawsuit presents federal statutory issues arising from the pervasive environmental harm threatened by the most recent efforts to expand and extend the southern portion of the regional roadway system composed of, and linked with, Texas State Highway Loop 1, or "MoPac." (*The Loop 1 roadway is commonly referred to in the Austin area as MoPac, a shorthand acronymic reference to the Missouri Pacific Railroad right-of-way originally tracked by MoPac.*)

20.   MoPac is typically discussed in two parts, MoPac North and MoPac South, linked into one continuous piece at Cesar Chavez Street which runs east-west along the north bank of the Colorado River. MoPac North stretches 14.8 miles from Cesar Chavez to the freeway's north end where it ties into State Highway 45 North, a tolled road looping east for about two miles to link with Interstate Highway 35 in far North Austin and then continuing east to the State Highway 130 toll road. By sometime in late 2016 or early 2017, two more lanes (one running north, the other south, both tolled) will have been added to an 11.2-mile stretch of MoPac North that

ends at Parmer Lane merging into six tolled lanes in MoPac North's 3.6 northernmost miles. Its entire span is now, and will be, continuous-drive with no intersections.

21.     MoPac South runs south for 10.2 miles, from Cesar Chavez to its current southern terminus point, where it links with State Highway 45 West, which heads westward from there to FM 1826. MoPac South has two traffic intersections, one at Slaughter Lane about eight miles from Cesar Chavez and one at La Crosse Avenue eight-tenths of a mile south of the Slaughter intersection. It is only 1.4 miles from La Crosse to the southern terminus of MoPac South. In contrast to MoPac North, MoPac South traverses one of the most environmentally sensitive and significant areas in the State of Texas. Most of it is over the recharge zone of the highly vulnerable underground waters of the Barton Springs segment of the Edwards Aquifer.

## B.     MoPac: historical context.

22.     MoPac began to take form in the early-to-mid 1970s when its first leg was built running north from the Colorado River for only 5.4 miles, less than a quarter of its current length. The population of Austin was much smaller then, only 30% of the current population. Constructed and expanded over a 34-year period ending in 2006, MoPac has grown to a 25-mile, mostly 4-to-8-lane, north-south high-speed freeway bisecting the Colorado River in central Austin less than a mile west of downtown.

23.     The current configuration of MoPac South was pieced together sporadically over two decades. Using a phased approach, the state transportation agency has never conducted a comprehensive environmental evaluation of its actions across the full expanse of current MoPac South.

24.     The environmental sensitivity and significance of the area traversed by MoPac South has made it a focal point over the years of environmental concerns. The piecemeal but

steady expansion and extension of MoPac South has given rise to frequent environmental controversies and associated public policy and judicial disputes. The latest effort to expand, improve, and "enhance" MoPac South, and to link it with other major roadways crossing other environmentally sensitive territory, has raised the environmental threat to a new level and is the focus of the legal claims in this lawsuit.

## C.   The MoPac South program and its three prongs.

25.    The defendant agencies are now trying to take the historic pattern of piecemealing MoPac South to unprecedented and improbable extremes. MoPac South is on the verge of a massive expansion, extension, and makeover costing upwards of five hundred million public dollars. TxDOT, working with CTRMA, has embarked on a course of action to turn MoPac South into a continuous-drive, high-speed freeway. Intersections would be eliminated, and it would have added toll lanes combined with a brand new 3.5-mile, 4-lane tolled highway—State Highway 45 Southwest/Phase I ("SH 45 SW")—which, in turn, would serve as MoPac South's link across environmentally sensitive land to a newly-expanded FM 1626 highway. In the end, after the half-decade or more it will take to complete the South MoPac expansion and linkage program, MoPac and the toll roads it joins will have become a continuous-drive highway running 31 miles, with toll lanes all the way—save for 2 miles of non-tolled lanes from Slaughter Lane to SH 45 SW. By replacing the current limited access at the southern end of MoPac with the SH 45 SW linkage to the FM 1626 corridor, traffic from I-35 and FM 1626 will be diverted to MoPac, and MoPac will be converted from a local commuter highway to a high-speed freeway alternative to Interstate 35.

26.    There is another link in play, too, already included in official transportation plans with a goal of completion by 2025. Known as "SH 45 SW Phase II," it is a 3.6-mile link from I-

35 to SH 45 SW's planned terminus at FM 1626. With the addition of a second-phase SH 45 SW, providing a direct link to Interstate 35, the conversion of MoPac into a second Interstate 35 would be further solidified. This second phase would also create a continuous tollway loop encircling Austin consisting of MoPac South and MoPac North on the west, SH 130 on the east, and SH 45 on the north and south. (*In TxDOT nomenclature, state highways ending in "5" are looped roads and those ending in "0" are linear.*) The existing eastern portion of this looped tollway—SH 130—runs along Austin's far east side, crossing much less environmentally sensitive territory than is crossed by MoPac South. The original plan—for SH 130 to be the through-alternative to I-35—is about to be replaced, with MoPac South and SH 45 SW supplanting it to become the I-35 avoidance route—potentially more convenient but actually far more harmful to the environment.

27.    In 2013, TxDOT, working hand-in-glove with CTRMA, took the first major step to launch coordinated actions to re-configure MoPac South. But, in taking this step, the agencies consciously avoided an evaluation of the potential environmental consequences of all of the MoPac South-related actions that they have set in simultaneous motion. Instead, evading full environmental accountability, TxDOT and CTRMA took the formalistic bureaucratic course of dividing their planned actions into three pieces, and donned blinders that conveniently offer only a constricted view of the environmental consequences of the actions, confined to each individual piece. By compartmentalizing their environmental studies, the agencies are avoiding advance evaluation of the panoply of significant consequences to the environment that will follow in the wake of their MoPac South endeavor. The three pieces of that endeavor are graphically depicted and briefly described as follows:

1--Northern 8.2 mile "Express Lanes" segment, adding 2 to 6 lanes from Cesar Chavez to 0.5 miles north of Slaughter Lane. Includes the corridor bottleneck, the bridge over Lady Bird Lake, and proposed flyovers to the overloaded Cesar Chavez. Though threatening several public treasures, this piece would be built last when other options have been lost.

2--Middle 2.1 mile long, misnamed "Intersections" segment adding 6 lanes from the southern end of the "Express Lanes" to 650 feet shy of the SH 45SW Phase I segment.

3--Southern 3.5 mile, SH 45 SW segment adding 4 tolled lanes and extending from 0.7 miles north of the MoPac/45SW intersection to the just completed 5-lane FM 1626 expansion. SH 45 SW Phase I would be built first.



(45SW Phase II (dotted line) would connect to I-35, to be completed by 2025.) All segments except 45SW Ph. I pursued as "federal" projects.

28.    Once completed, the new MoPac South/SH 45 SW/FM 1826 roadway would function as a major new north-south corridor, with far more traffic, as shown in this comparison diagram, where traffic estimates correlate to the width of the roadway.

*Figure 1: CAMPO Travel Demand Model Daily Traffic 2010 (without 45SW) and 2040*



29.    The change of the basic function of MoPac from local commuter highway to new inter-regional I-35 alternative is even greater when Phase II of SH 45 SW is constructed and/or tolls on SH 45 SW Phase I are reduced or eliminated.

30.    The attached Exhibit A provides additional detail on each of these three pieces of the MoPac South program.

**D.    Affected environment for the MoPac South system.**

31.    The realities of the MoPac South initiative presently underway expose how artificial the agencies' segmented approach is. The MoPac South system's effects cannot be confined to isolated geographic areas—although localized impacts will certainly occur. The program will

17

have effects across the entire geographic range, not just on pieces of the mosaic. And these effects will fall most directly and heavily on one body of water that is the single most significant environmental feature in Austin and its Central Texas environs: the Barton Springs segment of the Edwards Aquifer.

32. The Barton Springs segment of the Edwards Aquifer is a unified environmental feature. Its recharge zone spans 155 square miles. It is a highly transmissive groundwater body, fed by rainfall and surface runoff channeled through caves, sinkholes, faults, and fractures spread widely across its entire recharge zone. Pollutants entering the aquifer through such a surface feature located, for example, in the far southern extremity of the recharge area cannot be confined to that geographic area. The pollutants travel rapidly to other parts of the aquifer, flowing all the way to its northern surface outlet at Barton Springs. On the way, they can, and do, join and mix with pollutants entering through other surface features in other geographic areas of the recharge zone. Studies show that water and pollutants entering the aquifer from the farthest reaches of the plan being implemented—that is, from the area to be covered by SH 45 SW Phase I—can reach Barton Springs in three days or less, not in the three years TxDOT previously claimed.

33. The three pieces of the MoPac system would add substantial amounts of pavement over the Barton Springs recharge zone. Construction activities would disturb and disrupt large additional acreages of recharge zone. The system would, both directly and indirectly, spur additional development on, and immediately upstream of, the recharge zone, leading to far more impervious cover and land disturbance and resulting water pollution, erosion, flooding, and degradation of aquatic salamander habitat. The cumulative effects of this pavement, construction phase disturbances and gouging into the aquifer, and post-construction pollution runoff from car and truck droppings and the inevitable spills will harm the aquifer, Barton Springs, and the en-

dangered aquatic salamanders. Urbanization, specifically including highway construction and operation, was identified by the U.S. Fish & Wildlife Service ("U.S. FWS") as one of the primary factors threatening the survival of the Austin Blind salamander, and warranting the listing of the species as endangered in August 2013. 78. Fed. Reg. 51278 (Aug. 20, 2013).

34.   SH 45 SW Phase I would cross numerous caves and sinkholes which serve as direct pathways to the Aquifer. It passes within 300 feet of the mouth of Flint Ridge Cave, one of the largest in Travis County and currently required to be protected by a federal permit issued by the U.S. FWS to the City of Austin and Travis County. SH 45 SW would be constructed directly over Flint Ridge Cave, across the surface drainage basin that flows to the mouth of the cave and through a larger area that feeds recharging rainfall to the cave. Construction and operation of SH 45 SW also would require the clearing and fragmentation of mapped Golden-cheeked warbler habitat, and would degrade nearby warbler habitat with "edge effects" from highway noise, light, and visual pollution.

35.   Land clearing for and construction and operation of SH 45 SW Phase I will result in the incidental take of listed endangered Golden-cheeked warblers, Barton Springs salamanders, and Austin blind salamanders. Such incidental take must be approved by the U.S. FWS pursuant to an Endangered Species Act ("ESA") Section 10 "incidental take" permit or through a formal ESA Section 7 consultation process. Construction and operation of SH 45 SW Phase I will also require approval by U.S. FWS because it will be constructed over Flint Ridge Cave, a cave required to be protected by a U.S. FWS permit issued to the City of Austin and Travis County.

36.   All of the SH 45 SW and Intersections and about one-third of the Express Lanes segments fall within the flood-prone Onion Creek watershed. Project pavement, sealing over re-

charge lands and shunting water downstream, will increase downstream flooding and resulting property damage, as will additional development spurred by the MoPac South endeavor. In addition, the increased volume and speed of storm runoff from the MoPac South project will erode stream channels downstream, damaging stream-side private property and riparian parklands.

**E.    Interdependence versus fragmentation.**

37.    The piecemeal approach taken by the defendant agencies is a factually insupportable legal dodge. The MoPac South actions canvassed in the preceding paragraphs: (i) were devised at the same time; (ii) are undergoing evaluation (environmental, financial, programmatic, and otherwise) at the same time; (iii) will overlap in construction time; (iv) affect the same important, unique, and vulnerable environmental area; (v) are directed at altering operations of the same high-speed freeway; (vi) overlap with each other in the same geographic locale; and (vii) upon information and belief, are linked by interlocking financing. Taken together, the three pieces fundamentally change MoPac from serving local commuters, with limited access at the southern end, to creating a major new north-south travel corridor and alternative to Interstate 35. The piecemeal approach to environmental evaluation ignores this reality. By considering only piecemeal alternatives to each separate piece rather than considering alternatives to the actual full project, the agencies are acting in derogation of NEPA's core mandate, which requires advance analysis of alternatives to the full proposed action.

38.    The three pieces of the MoPac South system are, as explained, interdependent and inter-locking pieces of a single transportation infrastructure undertaking. The rationale for any one of them depends on its being tied together with the other two.

39.    SH 45 SW's northwestern terminus is specifically designed to tie seamlessly into MoPac South. It joins MoPac South only 650 feet short of the southern end of the MoPac South

Intersections project and is designed on the assumption that the Intersections project will be put in place. SH 45 SW Phase I, standing alone, is projected to funnel 20,000 to 30,000 more vehicle trips a day onto MoPac South adjacent to the Lady Bird Johnson Wildflower Center. The Center and its gardens front along the east side of MoPac South between LaCrosse and the proposed SH 45 SW interchange. The agencies' selling point for SH 45 SW Phase I is that it will relieve pressure on interior roadways such as Brodie Lane by moving traffic onto MoPac South, even though they concede that MoPac South is already over-crowded. In its current *pre*-SH 45 SW status, MoPac South is already loaded beyond its carrying capacity for substantial periods of time during the day. If SH 45 SW truly were a separate project, the agencies' rationale for building it would effectively rest on the improbable factual premise that they want to *worsen* an already bad traffic situation on MoPac South.

40.    But the worsening traffic situation on MoPac South is the reason that the agencies give for the 2.1 mile, six-lane Intersections Project. They represent that it is critical to relieving the excessive burdens on MoPac South, yet it would exacerbate those burdens by helping speed delivery of I-35 and FM 1626 traffic to MoPac by building SH 45 SW first. And their defense of the MoPac South Express Lanes project is the need for turning MoPac South into more of a high-speed throughway for shuttling traffic more rapidly between northern Hays County and downtown Austin—which of course circles back to meshing with the SH 45-SW Phase I objective.

41.    The only way the justifications for each of these three "projects" can actually be fulfilled is if all three of the projects are put into operation, as a unity and not as three separate transportation options. None of the three has independent utility, much less "substantial" independent utility.

42.   Taking SH 45 SW Phase I in isolation, it conceivably might, on its own, relieve some small amount of pressure on interior roadways in the area, but it can do so only by adding tens of thousands of more trips per day worth of *more* congestion to the already over-congested MoPac South from its southern terminus to and beyond the MoPac bridge over Lady Bird Lake. It is only with the subsequent addition of the MoPac Intersections project *and* the MoPac South project that the idea of relieving pressure on interior roadways can be a net plus. In short, SH 45 SW Phase I has no utility as an element of South Austin transportation infrastructure unless and until the other two projects currently being moved forward for MoPac South go forward at essentially the same time. In fact, as currently pitched, TxDOT and CTRMA will significantly *exacerbate* the existing traffic problems for MoPac South by using SH 45 SW Phase I to funnel increased traffic onto MoPac South just as MoPac South's traffic problems will be made worse by the initiation of a half decade or more of construction on the intersections and the expanded express lanes. The MoPac South Express Lanes project must, as a matter of common sense, be scaled and designed to fit with the MoPac Intersections project and the added traffic from SH 45 SW Phase I. The Intersections project and the four lanes of toll roads added by the Express Lanes project do not take on substantial utility unless and until they tie together with the four new toll lanes added at the end of MoPac South by SH 45 SW Phase I. This is the opposite of "independent" utility. Rather, any utility would be *dependent*.

**F.      Formal action by the agencies.**

43.   TxDOT and CTRMA completed a "state" Environmental Impact Statement (or "EIS") on SH 45 SW Phase I in early 2015. The study's improbable conclusion is that there would be no significant environmental impacts despite the size, geographic setting, and function of this toll road. A subsequent reevaluation of the state EIS remains pending at this time. This

22

state review process, unrestrained by the NEPA statutory framework, was undertaken on the stated rationale that SH 45 SW Phase I is a stand-alone project which will not use any federal funds. However, the state EIS, among many other deficiencies, only analyzed traffic impacts on the MoPac South segments to the north in future years *assuming* MoPac South would have been already expanded with additional lanes, as is currently being contemplated by the other two pieces of the MoPac South expansion and extension plan. Although acknowledging that SH 45 SW Phase I would—if built first—add substantial additional traffic onto an already overloaded MoPac South, no steps were taken to evaluate those near-term traffic impacts occurring before MoPac South is expanded, or to reconsider the sequencing of construction of the three pieces of the MoPac South system.

44.     In December 2015, TxDOT issued its Final Environmental Assessment ("EA") under NEPA for the MoPac Intersections Project. The EA only considers a build and "no build" option, and assumes that SH 45 SW Phase I is completed. It is accompanied by a "finding of no significant impact" ("FONSI") and does not contain any cumulative or indirect effects analysis under either scenario of with or without the SH 45 SW Phase I segment on one side and the MoPac South project on the other (or with SH 45 SW Phase II completed). Only very recently, TxDOT published its notice of final federal actions for the Intersections project. *See* 81 Fed. Reg. 8587 (Feb. 19, 2016). Without the tens of thousands of additional car and truck trips per day delivered by SH 45 SW Phase I onto the southern terminus of MoPac, much cheaper, immediate, and less environmentally damaging options could be evaluated and implemented to improve traffic flow at the Slaughter and La Crosse intersections without building freeway main-lanes and bridges.

45.    As with SH 45 SW Phase I and the MoPac Intersections, TxDOT and CTRMA initiated environmental review of the MoPac South Express Lanes project in 2013. TxDOT and CTRMA represent that the MoPac South process is under NEPA requirements and will be initiated with the publication of a draft Environmental Assessment. That publication date has been pushed back at least two times, but is currently set for early 2016, with an "environmental decision" set for late 2016 or early 2017. TxDOT and CTRMA recently held a public input session to take public comment on six different versions of a "variable toll" expansion to South MoPac, with the only non-tolled option being a "no build" option. Current proposals for MoPac South, not counting the planned Phase II of SH 45 SW, are being evaluated for their environmental impacts as three wholly separate projects, having isolated, and confined effects (although the "MoPac Intersections" study process is embedded within TxDOT and CTRMA's website for the "MoPac South" environmental study).

**G.    Inconsistent with NEPA requirements.**

46.    NEPA contains "action-forcing" provisions to ensure that those undertaking major federal actions with the potential to significantly affect the human environment, in effect, look before they leap. TxDOT and CTRMA are engaging in a course of action to evade NEPA.

47.    The FHWA, in whose shoes TxDOT stands in this case, has warned against the approach TxDOT and CTRMA are trying to take in reviewing the MoPac South project's environmental impacts. The FHWA has specifically said: "Piecemealing proposed highway improvements in separate EISs is to be avoided." FHWA Policy & Procedure Mem. 90-1. "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).

48.    The MoPac South actions of TxDOT and CTRMA are subject not only to NEPA, but also to the NEPA-implementing regulations promulgated by the FHWA and by the federal Council on Environmental Quality ("CEQ"). The FHWA regulations guiding NEPA compliance are codified at 23 C.F.R. Part 771; the CEQ NEPA regulations, at 40 C.F.R. Part 1500. Federal courts have long held that the CEQ NEPA regulations are binding. The FHWA NEPA regulations also are binding on FHWA projects. *See* 23 C.F.R. § 771.109(a)(1).

49.    In relevant part, the FHWA NEPA regulations provide in 23 C.F.R. § 771.111(f):

In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:

   (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

   (2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

   (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

50.    The overarching principle of this regulation is to ensure that agency evaluation of likely impacts and transportation project alternatives take place *before* a sequence of activities is set in motion so that alternatives to the anticipated course of action are not foreclosed by prior activities. Instead of acting consistently with this NEPA requirement, TxDOT and CTRMA have segmented their chosen course of action to narrow the range of alternatives evaluated. By looking only at alternatives to each piece, the agencies avoid looking at alternatives that would move north-south traffic along the I-35 corridor between northern Hays County and southern Williamson County without diverting traffic from the I-35 and FM 1626 corridors over to MoPac

South—and onward to MoPac North. Instead, the agencies chop their MoPac South plans into at least three pieces (and even four, if SH 45-SW Phase II is counted), then narrow the alternatives analysis to the smaller universe of each isolated piece.

51.    The agencies may avoid looking at the broader scope and its alternatives only if they demonstrate that they meet the three conditions laid down in subsections (1), (2), and (3) of 23 C.F.R. § 771.111(f). Under the facts of this case, they cannot meet the subsections' requirements.

52.    In the context of metropolitan roadway expansion, the most important of these three criteria is the requirement that "substantial independent utility" be established for a given aspect. *See Save Barton Creek Ass'n v. FHWA*, 930 F.2d 1129, 1140 (5th Cir.), *cert. denied*, 505 U.S. 1220 (1992). The agencies cannot satisfy this test.

53.    Flying directly in the face of federal requirements for environmental evaluation, the three-segment approach, and the move to build SH 45 SW first, will result in "commitments to transportation improvements" before they are fully evaluated. These commitments include an estimated $108 million commitment to the SH 45 SW project and, in turn, an estimated $46 million to the MoPac Intersections project, before the MoPac South segment and the larger project are evaluated.

54.    Nor do the three segments meet another standard of FHWA's NEPA regulations; they do not connect logical termini. The terminus of the MoPac Intersections project a mere 600 feet from the western terminus of SH 45 SW is devoid of independent logic. The northern terminus of the MoPac Intersections project and southern terminus of the MoPac South project at a point one-half mile north of Slaughter Lane is not logical since the two pieces are being pursued at the same time and depend on each other for their functionality and financing; one-half mile

north of Slaughter Lane does not mark any meaningful connecting route. The southeast terminus of SH 45 SW Phase I at FM 1626 is only made "logical" with the just-now completion of the expansion of FM 1626 from 2 lanes to 5 lanes (a federal action subject to NEPA).

55.    Slicing the South MoPac plans into three pieces without a cumulative evaluation of the environmental impacts, taken together, effectively pre-ordains the other pieces, thereby "restricting the consideration of alternatives" in violation of 23 C.F.R. § 771.111(f)(3). One segment does not make sense without the other two. Allowing them to be built—and evaluated—piecemeal results in a *fait accompli* insofar as the whole MoPac South plans are concerned. Rather than having independent utility, SH 45 SW in isolation results in disutility—a disutility that can only be solved by expanding MoPac South and re-routing around intersections, thereby threatening still more environmentally destructive actions.

56.    The construction of SH 45 SW Phase I also restricts consideration of alternatives because it ties down the end-point of the proposed SH 45 SW Phase II. The toll-backed debt financing of SH 45 SW Phase I and of the MoPac South segment will restrict consideration of a "no build" option on SH 45 SW Phase II because both of the former segments will need the traffic flow from I-35 and SH 45 SE (southeast) to deliver toll-paying traffic and pay off their respective debt.

57.    None of the three would be a "reasonable expenditure" standing on its own, without the other segments and without the recently-completed federal FM 1626 expansion connecting at the southeast end of the proposed SH 45 SW.

58.    Flaunting NEPA's underlying purpose, the three segments are not "of sufficient length to address environmental matters on a broad scope." To the contrary, the three-segment

approach prevents a meaningful environmental evaluation of the impact of the overall project on Barton Springs, the listed aquatic salamanders, and Onion Creek.

## H.   Connected, cumulative, and similar actions.

59.   While representing a single course of action, TxDOT and CTRMA's SH 45 SW and MoPac South actions also conflict with CEQ's NEPA regulations requiring that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action" be evaluated in a single impact statement. 40 C.F.R. § 1502.4(a). Thus, while projects may be defined, to some extent, as distinct actions, they nevertheless must be evaluated in a single NEPA study if they are "connected," "cumulative," or "similar" actions sharing common timing, geography, and likely impacts. *Id*. § 1508.25(a).

## I.   Section 4(f): Use of Wildflower Center

60.   Two federal statutory provisions—49 U.S.C. § 303 and 23 U.S.C. § 138 (the latter specifically directed at FHWA projects)—prohibit the use of federal funds for transportation programs or projects that constitute "use" (including constructive use) of such resources as parks and recreation areas that have been determined to be of national, state, or local significance. (*Typically, these provisions are referred to as "Section 4(f)," which is from a former statutory designation.*)

61.   Under the 2014 Texas-NEPA MOU, the obligation of complying with Section 4(f) has devolved to TxDOT, standing in the FHWA's shoes here just as it does for NEPA purposes. *See* 2014 Texas-NEPA MOU ¶¶ 3.2.1 and 3.2.8.

62.   The Wildflower Center has been designated a park or recreation area of significance under 23 C.F.R. § 774.15(e)(1).

28

63.     Together, the Intersections project and the Express Lanes project, each indisputably an intended recipient of federal funds, will impose significant additional noise, light, and adverse visual impacts on the Wildflower Center, to such an extent that they will constitute constructive use of the Center. Such use would violate Section 4(f). The ramps connecting SH 45 SW with MoPac South will be elevated and will inevitably project traffic noise onto the Wildflower Center site. Even taking SH 45 SW in isolation, the projected traffic noise from the tens of thousands of additional cars and trucks delivered along the western boundary of the Center's gardens and trails will severely diminish the outdoor experience of visitors to the Center. Proposed "sound walls" to mitigate noise and visual blight from the Intersections project would, if built, only minimally reduce noise while creating visual blight on both sides of the wall. As noted in a recent letter from the Center's Interim Director to TxDOT, the proposed SH 45 SW Phase I would "jeopardize [the] viability" of the Center.

## V.   CAUSES OF ACTION

### A.     Claim 1: NEPA

64.     ¶¶ 1-63 are incorporated.

65.     In embarking on their MoPac South program, including TxDOT's notice of final federal actions on February 19, 2016, without an analysis of the cumulative impacts of, and alternatives to, the entire program, the defendant agencies are violating NEPA and its implementing regulations, as well as 5 U.S.C. § 706(2)(A).

### B.     Claim 2: NEPA

66.     ¶¶ 1-63 are incorporated

67.     Because SH 45 SW Phase I is subject to regulation and approval by the U.S. Fish & Wildlife Service, it is subject to NEPA as a federal project. 23 CFR 1508.15 and 1508.18(a). The

defendant agencies have violated NEPA and its implementing regulations, as well as 5 U.S.C. § 706(2)(A), by failing to perform an analysis of the cumulative impacts of, and alternatives to, the entire MoPac South program in connection with the environmental studies and decision documents for SH 45 SW Phase I and by failing to perform a legally sufficient study of the impacts of, and alternatives to, the SH 45 SW Phase I project in itself.

**C.      Claim 3:  Section 4(f)**

68.     ¶¶ 1-63 are incorporated.

69.     The defendant agencies' MoPac South Intersections project, in conjunction with the SH 45 SW Phrase I and MoPac South Express Lanes projects, violates Section 4(f) by constructively using the Lady Bird Johnson Wildflower Center.

## VI. PRAYER FOR RELIEF

70.     Based upon the foregoing matters, Plaintiffs respectfully request that this Court grant them the following relief:

a.   assume jurisdiction over this action;

b.   issue a preliminary injunction to preserve the *status quo* and prohibit TxDOT and CTRMA from undertaking any construction activities, either preparatory or in furtherance of the actual construction, of either SH 45 SW (including actions pursuant to the TxDOT Record of Decision for that roadway) or the Intersections project (including actions pursuant to the TxDOT Record of Decision for that project), until the defendant agencies have performed a comprehensive environmental evaluation under NEPA of the potential impacts, cumulative and otherwise, of their current MoPac South actions (SH 45 SW Phase I project, Intersections project, and Express Lanes project);

c.   issue a declaratory judgment that TxDOT and CTRMA have violated NEPA by failing to undertake a full environmental study, including the potential cumulative effects of and evaluating alternatives to their currently planned course of action for MoPac South (SH 45 SW Phase I project, Intersections project, and Express Lanes project);

d.   issue a mandatory injunction requiring TxDOT and CTRMA to comply with the provisions of NEPA with regard to any and all their actions in pursuit of their current plans for MoPac South (SH 45 SW Phase I project, Intersections project, and Express Lanes project), including a prohibition on the defendant agencies undertaking any construction

activities, either preparatory or in furtherance of the actual construction, of either SH 45-SW (including actions pursuant to the TxDOT Record of Decision for that roadway) or the Intersections project (including actions pursuant to the TxDOT Record of Decision for that project), until the defendants have performed a comprehensive environmental evaluation under NEPA of the potential impacts, cumulative and otherwise, of their current MoPac South actions (SH 45 SW Phase I project, Intersections project, and Express Lanes project);

e.  issue a declaratory judgment that TxDOT and CTRMA will be in violation of Section 4(f), in relation to the Lady Bird Johnson Wildflower Center, if they pursue their current plans for MoPac South;

f.  issue a mandatory injunction under Section 4(f), in relation to the Lady Bird Johnson Wildflower Center, prohibiting the defendant agencies from pursuing in any fashion preparatory or construction work on any of their current plans for MoPac South for the Intersections Project and SH 45 SW Phase I project adopted in the TxDOT Records of Decision for those actions;

g.  award Plaintiffs their costs, fees, and other expenses under 28 U.S.C. § 2412; and

h.  grant Plaintiffs such other and further relief as may be necessary, appropriate, and equitable.

Respectfully submitted,

_____/s/ Renea Hicks_____
Renea Hicks
Attorney at Law
Texas Bar No. 09580400

LAW OFFICE OF MAX RENEA HICKS
101 West 6th Street, Suite 504
Austin, Texas 78701
(512) 480-8231
Fax (512) 480-9105
rhicks@renea-hicks.com

_____*/s/ Daniel R. Richards*_____

**Daniel R. Richards**
Texas Bar No. 00791520
drichards@rrsfirm.com
**Clark Richards**
Texas Bar No. 90001613
crichards@rrsfirm.com
**Richards Rodriguez & Skeith, LLP**
816 Congress, Suite 1200
Austin, Texas 78701
Tel 512-476-0005
Fax 512-476-1513

_____

William G. Bunch
W.D. Tex. Bar No. 0334520

SAVE OUR SPRINGS ALLIANCE
905 W. Oltorf, Suite A
Austin, Texas 78704
T. (512) 477-2320
F. (512) 477-6410
bill@sosalliance.org

**ATTORNEYS FOR PLAINTIFFS**